UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Brian McDonough; Melanie McDonough; and Anne N. Posnack, Tr.; for themselves and on behalf of all others similarly situated,
    Plaintiffs

    v.

First American Title Insurance Company,
    Defendant

Case No. 10-cv-106-SM
Opinion No. 2011 DNH 015

**O R D E R**

In a putative class action, removed from the New Hampshire Superior Court, plaintiffs assert a federal claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count I), as well as state common law claims for breach of contract and unjust enrichment. Plaintiffs are homeowners who refinanced mortgages. They allege that First American Title Insurance Company ("First American"), acting in concert with a "network" of title agents who sold First American title insurance, collected premiums at an "original rate," rather than a lower "reissue rate" to which they were entitled. Before the court is defendant's motion to dismiss the federal RICO claim for failure to state a claim upon which relief can be granted. Plaintiffs object. For the reasons given, defendant's motion to dismiss is granted.

**The Legal Standard**

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). That is, the complaint "must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

When considering a motion to dismiss under Rule 12(b)(6), a trial court "assume[s] the truth of all well-plead facts and give[s] the plaintiff[s] the benefit of all reasonable inferences therefrom." Vernet v. Serrano-Torres, 566 F.3d 254, 258 (1st Cir. 2009) (quoting Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). Finally, however, a Rule 12(b)(6) motion should be granted if "the facts, evaluated in [a] plaintiff-friendly manner, [do not]

contain enough meat to support a reasonable expectation that an actionable claim may exist." Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008) (citations omitted).

**Background**

The relevant facts, drawn from the complaint and evaluated in a plaintiff-friendly manner, are as follows.

Brian and Melanie McDonough ("the McDonoughs"), and Anne Posnack, each refinanced home mortgages in 2008. The refinanced mortgages were less than five years old. When they refinanced, the McDonoughs, and Posnack each purchased lender's title insurance policies issued by First American. They were charged a premium applicable to the original issuance of title insurance, instead of a lower "reissue rate" that applied when "a borrower refinances within FIVE years of a recorded first mortgage by an institutional lender." (Second Am. Decl. (document no. 2-5), at 16.) At all times relevant to this matter, both First American's original rate and its reissue rate were on file with the New Hampshire Insurance Commissioner. Because they paid the original rate, rather than the lower reissue rate for which they qualified, the McDonoughs were overcharged by $234.20, and

Posnack was overcharged by $364.70.  The named plaintiffs claim to represent many others who are similarly situated.

First American sells title insurance through title agents. Different title agents handled the transactions described in the complaint: Monique D. Donovan Law Office, LLC (McDonough), and Mazerolle & Frasca PA (Posnack).  Title agents generally conduct title searches, that yield information necessary to determine whether a refinancing homeowner qualifies for First American's reissue rate.  The title agents are paid commissions by First American that generally consist of a percentage of the premiums paid for the policies they sell.

First American's title agents operate under "title agency agreements with First American, pursuant to which they arrange, sell, produce, issue and otherwise assist First American in issuing title insurance policies." (Second Am. Decl. ¶ 71). Each "agency agreement . . . states the conditions under which the title agent is authorized to issue title insurance policies on behalf of First American."  (Id. at ¶ 76.)

The title agents "are not employees of First American, but rather they are licensed, nonexclusive agents who work with different title insurance companies." (Id. ¶ 72.)  They are

"separate, independent entities who do not function as subsidiaries or employees of First American."  (Id.)

"The title agents [conduct title searches and calculate title-insurance premiums] subject to First American's direction and control."  (Id. ¶ 73.)  That direction and control "include[s] the use of standardized systems and procedures for conducting title searches, for calculating, collecting and processing payments for title searches and title insurance policies, and for providing title insurance for lenders and owners."  (Id. ¶ 75.)  First American "has an agent selection process and audit review program" (id. at ¶ 76), "conducts periodic audits of its title agents" (id.), and "performs on site inspections of the title agents' books and records on an annual basis" (id.).  First American also "issues the standardized manuals to be followed by all of the Title Agents in connection with the production of title insurance policies" (id. ¶ 77); it "touts . . . [a] title closing production software system specifically designed by First American for its title agents" (id. ¶ 78); and it provides its title agents with onsite and online training for that system (id.).

In their complaint, and throughout their pleadings, plaintiffs refer to First American's "network of title agents."

5

(Id. ¶ 2.)  They allege no facts, however, suggesting any connection or communication between or among First American's title agents.  Thus, the phrase "network of title agents" does not supportably allege any concerted or coordinated activity between or among those agents.

First American's title agents also serve as closing or settlement agents with respect to home purchases.  In that role, they prepare or review the HUD Settlement Statements presented to homeowners at closing.  Those statements list, among other things, the premium charged and paid for title insurance.  In addition, First American's title agents, acting as settlement agents, collect and disburse premium payments to First American.

The following paragraph in the complaint neatly encapsulates the essence of plaintiffs' claims:

> First American was able to accomplish its fraudulent scheme because of the dual role performed by the Title Agents, i.e., that of Settlement Agent as well as that of Title Agent.  This has enabled First American to control the closing, have the fraudulent inflated charges inserted into the HUD Settlement Statements, and receive the misappropriated sums. Because the Title Agent and Settlement Agent were one and the same, the plaintiffs and class members were lulled into a false sense of security by the Title Agent/Settlement Agent that the correct amount was charged for title insurance.  And there are no checks and balances in place – there was no helpful, or at least uninterested, entity conducting the closing, to review the paperwork and explain the charges (including

      the title insurance charges) to the homeowner, and to
      potentially discover the fraudulent charge and point it
      out to the homeowner.

(Id. ¶ 83.)

Regarding the underlying mail and wire fraud allegations — the criminal conduct allegedly engaged in by First American and its title agents — plaintiffs allege that: (1) First American and/or its title/settlement agents transmitted to mortgage lenders, by mail or by wire, inflated title insurance premium figures; (2) mortgage lenders sent plaintiffs Good Faith Estimates of closing costs, by mail, that included the inflated insurance premiums; (3) mortgage lenders transmitted, by wire, loan proceeds used to pay the inflated insurance premiums; (4) title/settlement agents transmitted to First American, by wire, insurance premiums; and (5) title/settlement agents transmitted to mortgage lenders, by mail or wire, title insurance policies.

## Discussion

Plaintiffs' civil RICO claim asserts that First American used an enterprise, consisting of itself and its title agents, as a vehicle to commit mail and wire fraud. First American moves to dismiss plaintiffs' RICO claim on grounds that plaintiffs have failed to plead a valid "association-in-fact" RICO enterprise, and that they have failed to allege a predicate act of mail or

wire fraud with the degree of particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

    A.   <u>RICO Legal Standards</u>

Plaintiffs bring their RICO claim under 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The statute's purpose is two-fold: to protect "a legitimate 'enterprise' from those who would use unlawful acts to victimize it" and to protect "the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful . . . activity is committed." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 164 (2001) (citations omitted).

A valid claim under section 1962(c) "must allege each of the four elements required by the statute: (1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering activity." <u>Soto-Negrón v. Taber Partners I</u>, 339 F.3d 35, 38 (1st Cir. 2003) (quoting <u>N. Bridge Assocs., Inc. v. Boldt</u>, 274 F.3d 38, 42 (1st

Cir. 2001), citing <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)). The statute defines "enterprise" as any "legal entity," such as an "individual, partnership, corporation, association" and "any other union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). "[T]he Supreme Court has admonished that RICO and the term 'enterprise' be construed expansively." <u>United States v. Cianci</u>, 378 F.3d 71, 78-79 (1st Cir. 2004) (citing <u>Sedima</u>, 473 U.S. at 497-98; <u>Turkette</u>, 452 U.S. at 586-87.)

 B. <u>Association-in-Fact Enterprise</u>

In their complaint, plaintiffs generally characterize the contractual relationships between First American and its various title agents as creating a RICO association-in-fact enterprise. But First American points out that the complaint does not adequately plead facts showing First American to be sufficiently distinct from the enterprise described in the complaint; does not adequately allege the necessary structural features of a RICO association-in-fact enterprise (specifically, First American's title agents are not alleged to have had any relationship with each other); and does not allege a RICO enterprise independent of the purported racketeering acts on which First American is said to have engaged.

Defendant's first "association-in-fact" challenge raises a question not yet addressed by the court of appeals for this circuit — whether a corporate RICO "person" can associate with non-employee agents, such as the title agents described here, to form a RICO enterprise. Though some district courts in other circuits have answered that question in the affirmative (see e.g.,Levine v. First American Title Ins. Co., No. 09-842, 2010 WL 152133 (E.D. Pa. Jan. 14, 2010); Conte v. Newsday, Inc., 703 F. Supp. 2d 126, 136 n. 6 (E.D.N.Y. 2010)), there is reason to think otherwise, and, indeed, district court decisions in this circuit suggest a different result. See e.g., Mear v. Sun Life Assurance Co. of Canada, No. 06-12143-RWZ, 2008 WL 245217, at *9 (D. Mass. Jan. 24, 2008)(holding complaint that alleged defendant corporation and its agents comprised RICO enterprise, failed to state a claim "[b]ecause Sun Life, a corporation, can only act through its employees, officers, subsidiaries and agents."); see also, Rodriquez v. Banco Central, 777 F. Supp. 1043, 1054 (D.P.R. 1991)("[T]he distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact")(emphasis added). It is not necessary to resolve the issue in this case, however, because First American's second point, regarding the structure of the alleged enterprise, is correct. (The court likewise does not decide whether an

enterprise independent of the purported racketeering acts allegedly engaged in has been adequately pled.)

In <u>Boyle v. U.S.</u>, 129 S. Ct. 2237 (2009), the Supreme Court held that "an association-in-fact enterprise must have at least three structural features: a purpose, <u>relationships among those associated with the enterprise</u>, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle</u>, 129 S. Ct. at 2244 (emphasis added).  <u>See also</u> <u>Turkette</u>, 452 U.S. at 583 (explaining that existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit").

Explaining the structural attributes of an "association-in-fact," the Court stressed the importance of interrelationships between or among the association's parts:

> [T]he term structure means "[t]he way in which parts are arranged or put together to form a whole" and "[t]he interrelation or arrangement of parts in a complex entity."  American Heritage Dictionary 1718(4th ed. 2000)).
>
> ...
>
> The concept of "association" requires both interpersonal relationships and common interest.

129 S. Ct. at 2244

The First Circuit's pre-Boyle decisions are generally consistent with Boyle's "relationships" requirement.  See e.g., United States v. Cianci, 378 F.3d 71, 82 (1st Cir. 2004)("those associated in fact [must] 'function as an ongoing unit' and constitute an 'ongoing organization.' ".  Id. (quoting United States v. Patrick, 248 F.3d 11, 19 (1st Cir. 2001)).

Here, plaintiffs complaint seems to allege a RICO "enterprise" consisting of a "hub-and-spoke" structure, with First American as the hub and the various agents at the ends of the spokes.  But the complaint does not allege facts supporting a claim of any relationship between or among the title agents.  Plaintiffs say that the complaint nevertheless adequately alleges that First American and its title agents were organized as a "network" consisting of much more than a simple hub-and-spoke conspiracy.

The First Circuit has yet to decide whether a hub-and-spoke organization can qualify as an "enterprise" for RICO purposes. The Third Circuit's post-Boyle decision in In re Insurance Brokerage Antitrust Litigation, 618 F. 3d 300 (3rd Cir. 2010), however, persuasively addresses the point, as do pre-Boyle cases from the District of Massachusetts, in which hub-and-spoke

12

structures have been held not to qualify as RICO "enterprises." See In re Pharm. Indus. Av. Whsle. Price Litig., 263 F. Supp. 2d 172, 182-83 (D. Mass. 2003); In re Lupron®, 295 F. Supp. 2d 148, 173-74 (D. Mass. 2003).

In In re Insurance Brokerage, the Third Circuit upheld the dismissal of plaintiff's RICO claim for failure to adequately allege an "enterprise." 618 F. 3d at 370. Plaintiffs' complaint alleged facts suggesting that the defendant insurance broker was at the center of an association consisting of the broker as the hub, and numerous insurers at the end of the spokes. The court of appeals, applying the relatively new pleading requirements described in Twombly, 550 U.S. at 556, held that plaintiffs had not pled facts "plausibly implying the existence of an enterprise with the structural attributes identified in Boyle." 618 F. 3d at 370. The court found the complaint deficient in failing to plead Boyle's second structural attribute: "'relationships among those associated with the enterprise.'" Id. (quoting Boyle, 129 S. Ct. at 2244). Allegations that the broker had similar, but distinct agreements with each insurer, and that each insurer knew the identities of the broker's other insurer-partners, did not plausibly imply the existence of relationships between or among the insurers. Id. at 369-70. In short, plaintiffs "failed to plead any facts plausibly suggesting collaboration among the

insurers."  Id. at 374.  ......  See also Conte, 2010 WL 1257887, at *5 (holding that hub-and-spoke structure does not meet Boyle's second structural requirement).

In this case, plaintiffs heavily rely on Levine, 682 F. Supp. 2d at 456, in urging a different outcome.  While Levine is factually quite similar, and involves the same defendant, First American, First American appears not to have interposed a hub-and-spoke defense in that case.  In any event the opinion does not address the absence of any plausible allegations of an interrelationship between or among the title agents.

Not only is the Third Circuit's reasoning in In re Insurance Brokerage persuasive, but pre-Boyle decisions in the First Circuit also support the dismissal of civil RICO claims that allege only hub-and-spoke structures.  In In re Pharmaceutical Industry, for example, the court held that hub-and-spoke structures are not RICO "enterprises."  263 F. Supp. 2d at 182-83.  In that case, the plaintiffs "allege[d] twenty-one separate 'AWP Enterprises,' each consisting of a single defendant pharmaceutical company and all the medical providers that prescribe its drugs with a reported AWP."  263 F. Supp. 2d at 182.  The court characterized the alleged enterprise as "a hub-and-spoke design, with an individual drug manufacturer at the

14

center dealing independently with each individual provider as the spoke." Id. at 183.

In ruling that such a structure does not comprise a RICO enterprise, the court looked to the "analogous context" of anti-trust, where "the Supreme Court has rejected a similar alleged hub-and-spoke conspiracy which had a pattern of separate spokes meeting at the common center without the rim of the wheel to enclose the spokes." Id. (citing Kotteakos v. United States, 328 U.S. 750, 769 (1946)). The court cautioned, as did the Supreme Court in Kotteakos, "'against confusing the common purpose of a single enterprise with the several, though similar, purposes of numerous separate enterprises of like character.'" Id. (quoting Kotteakos, 328 U.S. at 769. See also In re Lupron®, 295 F. Supp. 2d at 173-74, & n.29 (holding that an alleged organization, consisting of a pharmaceutical products company and all doctors and other distinct providers of medical services who dispensed the drug Lupron® to patients, did not comprise a RICO association-in-fact enterprise).

The complaint here fails to allege a RICO "enterprise" because the allegations plausibly suggest only a hub-and-spoke structure, with no relationships between the title agents — no connecting rim. As in In re Insurance Brokerage, plaintiffs

15

merely allege a series of distinct, albeit similar, contractual relationships between First American and its independent title agents.  The complaint does not allege any relationship between or among the title agents (the spokes).  Finally, the complaint's general allegation that the title agents worked as a "network" does not suffice.  It is a mere conclusory allegation, and cannot, without more, "plausibly suggest[...] collaboration among the insurers."  In re Insurance Brokerage, 618 F. 3d at 374.  And, the allegation is belied by plaintiffs' own detailed factual allegations describing only individual relationships between First American and its distinct title agents.

For these reasons, the court finds that the complaint fails to plausibly allege "relationships among those associated" (Boyle, 129 S. Ct. at 2244), and so fails to state a civil RICO claim.

## Conclusion

Because the complaint does not allege a valid association-in-fact RICO enterprise, First American is entitled to dismissal of plaintiffs' RICO claim.  Accordingly, First American's motion to dismiss (document no. 10) is granted.  The Second Amended Complaint is dismissed.  Plaintiffs may file a third amended complaint, within thirty (30) days of the date of this order,

16

limited to correcting the pleading deficiencies addressed, <u>if</u> it can do so supportably and in good faith (<u>see</u> Fed. R. Civ. P. 11(b)).

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

January 28, 2011

cc: Edward K. O'Brien, Esq.
    Charles A. Newman, Esq.
    Elizabeth T. Ferrick, Esq.
    Hannah F. Preston, Esq.
    Andru H. Volinsky, Esq.